LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs, and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALYSSA CRUZ, *on behalf of herself,*
*FLSA Collective Plaintiffs, and the Class,*

      Plaintiff,

      v.

HSBC BANK USA, N.A.,

      Defendant.

---

Case No.:

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Jury Trial Demanded

      Plaintiff, ALYSSA CRUZ ("Plaintiff"), on behalf of herself and others similarly situated, by and through her undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendant HSBC BANK USA, N.A. ("Defendant") and states as follows:

<u>**INTRODUCTION**</u>

      1.    Plaintiff alleges, on an individual basis, that she was deprived of her statutory rights as a result of Defendant's unlawful discrimination practices and hostile work environment on the basis of gender, in violation of New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), and New York City Human Rights Law, Administrative Code of the City of

New York § 8-107 ("NYCHRL") and brings this action against Defendant to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

2.     Plaintiff further alleges, on an individual basis, that Defendant violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq, when they would not allow Plaintiff time off due her pregnancy. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

3.     Plaintiff further alleges, on an individual basis, that Defendant violated the New York City Earned Safe and Sick Time Act ("ESSTA") when they denied her sick leave with regards to her pregnancy and resultant complications. Plaintiff seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorney's fees and costs.

4.     Plaintiff further alleges, on an individual basis, that Defendant violated the Americans with Disabilities Act, 42 U.S.C § 12102 et seq., when they failed to accommodate her pregnancy-related disabilities.

5.     Finally, Plaintiff also alleges, on an individual basis, that she was deprived of her statutory rights as a result of Defendant's unlawful retaliation, in violation of the NYSHRL, NYCHRL, FMLA, ADA, and ESSTA and brings this action against Defendant to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

6.     On behalf of herself and similarly situated individuals, Plaintiff alleges that, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), she and others similarly situated are entitled to recover from Defendant: (1) unpaid wages, including overtime, due to time shaving; (2) liquidated damages; and (3) attorneys' fees and costs.

7.      Plaintiff further alleges that, pursuant to the New York Labor Law ("NYLL"), she and others similarly situated are entitled to recover from Defendant: (1) unpaid wages, including overtime, wages due to time shaving; (2) statutory penalties; (3) liquidated damages; and (4) attorneys' fees and costs.

8.      Defendant HSBC Bank USA, N.A. is the American subsidiary of the multinational banking conglomerate HSBC.  During all relevant times, Defendant has offered banking and financial services across the United States while operating and setting nationwide policy from its headquarters located at 452 Fifth Avenue, New York City, NY 10018. From this New York headquarters, Defendant set wage policies for numerous branches which are located across the United State, including, but not limited to, the following: (i) New York (145 branches), (ii) California (43 branches), (iii) Connecticut (3 branches), (iv) Florida (12 branches), (v) Maryland (4 branches), (vi) Pennsylvania (2 branches), (vii) Virginia (6 branches), (viii) Washington (8 branches), (ix) D.C. (3 branches), and (x) New Jersey (8 branches) (the "Branches").

9.      Plaintiff, FLSA collective members, and Class members are all current and former employees who worked as tellers, client experience associates, retail business bankers, relationship bankers, relationship managers, premier bankers, life and retail business bankers, and similar positions for any of Defendant's branches ("the Class"), and were victims of Defendant's underpayment of wages, including overtime.

10.     Plaintiff brings this wage and hour class action on behalf of herself and all persons, who during the applicable limitations period up to and including the present, were similarly underpaid by Defendant in violation of protections afforded under the FLSA, parties' agreements, and the laws and regulations passed in the following states:

    i.    California: California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; and the California Labor Code and relevant Industrial Welfare Commission Wage Order;

    ii.    Connecticut: Connecticut Wage Act Conn. Gen. Stat. §§31-58, *et seq.*;

    iii.    District of Columbia: District of Columbia Minimum Wage Act Revision Act, D.C. Code § 32-1001 *et seq.*;

    iv.    Florida: Florida's Minimum Wage Act's, Fla. Stat. 448.08 *et seq.*;

    v.    Georgia: Georgia Minimum Wage Law, Official Code of Georgia Annotated O.C.G.A. § 34-4 et seq.;

    vi.    Illinois: Illinois Labor Laws, 820 ILCS 105 et seq.;

    vii.    Maryland: Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. § 3-401 *et seq.*, and the Maryland Wage Payment Collection Law, Lab. & Empl. § 3-501 *et seq.*;

    viii.    New Jersey: New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 *et seq.*; and the New Jersey Wage and Hour Law, N.J.S.A. §§ 34:11-56a *et seq.*;

    ix.    New York: New York Labor Law, Article 19 § 650 et seq., and Article 6 § 190 *et seq.*;

    x.    Pennsylvania: Pennsylvania Minimum Wage Act 43 Pa. Cons. Stat. § 333.101 *et seq.*;

    xi.    Texas: Texas Minimum Wage Act, Texas Labor Code § 62.001 et seq.;

    xii.    Virginia: Virginia Minimum Wage Act, VA Code § 40.1 *et seq.*;

    xiii.    Washington: Washington Minimum Wage Act, R.C.W. 49.46.005, *et seq.*; and Washington Minimum Wage Rules, WAC 296-126 *et seq.*;

11.    Defendant instituted a nationwide policy of not compensating meal breaks of employees, despite employees being forced to work through their meals. Defendant required Class members to self-report for meal breaks and for their weekly work hours. As part of this self-reporting, employees were instructed to record their exact scheduled hours, including scheduled meal breaks, and not self-report any hours over 40 hours in a week, unless overtime work was pre-approved by management. Defendant was aware that Class members worked through the meal breaks and implemented a policy that fostered employers to self-report less time even though its written policy urged employees to report accurately.

12.    While self-reporting clock-outs for meals, employees would either work through lunch or were required to eat at their station, undertake training, respond to phone calls, and aid in customer requests. Plaintiff, FLSA collective members, and Class members were (i) not permitted to leave their premises of work for meals, (ii) not permitted a free and clear meal-break and (iii) were forced to work through meals entirely. Despite employees like Plaintiff never being permitted a free and clear meal-break, Defendant never compensated Plaintiff and other employees for this time. *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 64 (2d. Cir. 1997) (Finding a lack of free and clear lunch break in part due to the fact employees lacked flexibility with regard to the lunch break and their presence at the work site was indispensable.); *see also* 29 C.F.R. Section 785.19 ("The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.").

13.    In addition to the failure to pay employees for all hours worked due to uncompensated meal breaks, Plaintiff, FLSA Collective Plaintiffs, and Class members worked hours beyond their schedules, including overtime hours, which they could not self-report without fear of reprisals. Plaintiff, FLSA Collective Plaintiffs, and Class members worked hours beyond their scheduled shifts but were instructed not to put time past 40 hours a week. Plaintiff, FLSA Collective Plaintiffs, and Class members would self-report 40 hours but work beyond that time to complete all required work and meet their Key Performance Indicators (certain quantified performance targets), in order to avoid being subject to productivity reviews and possible reprimand/termination.

14.    Additionally, at all times relevant to this action, Defendant failed to compensate employees, when they clocked-in-and-out for short breaks lasting anywhere between 1-minute to 20-minutes in violation of 29 C.F.R. § 758.18 and State wage laws.

15.     Plaintiff brings this wage and hour class action on behalf of putative collective members, and putative class members who were similarly underpaid by Defendant in violation of protections afforded under the FLSA and the applicable wage laws of each State where Defendant operates.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391 because the Defendant is headquartered in this District, all the events, Plaintiff, witnesses, policies, and procedures giving rise to this Complaint emanated from this District.

## PARTIES

18.     Plaintiff ALYSSA CRUZ is a resident of Queens County, New York.

19.     Defendant HSBC Bank USA, N.A. is a foreign corporation organized under the laws of the State of Virginia with a principal place of business located at 452 Fifth Avenue, New York City, NY 10018, and an address for service of process at 95 Washington Street, Sixth Floor, Buffalo, NY 14203.

20.      Defendant offers banking and financial services from offices and branches in cities across the United States including, but not limited to, New York, Los Angeles, Chicago, Atlanta, Houston, Seattle, Miami, San Francisco, and Washington, DC.

21.     All the Branch Locations are managed by the same executive management team operating from the same Headquarters in New York, which sets standardized policies and

managerial training.  Further, each Branch Location is engaged in related activities, share common ownership, and have a common business purpose:

(a) Defendant HSBC BANK USA, N.A., maintains a centralized payroll department and human resources department.  Defendant operates a single career page allowing interested persons to apply to positions relating to all Branch Locations.  Despite listing open positions across the country, Defendant centralizes payroll positions, marketing positions, executive management positions, IT positions, and other administrative roles at Defendant's headquarters in New York, New York.

(b) When seeking leave or company assistance with other employment issues, employees are directed to contact the same central office, which evaluates requests, hires, fires, trains managerial employees, and sets company-wide policy.

(c) Plaintiff and other employees were transferred between Branch Locations. When employees move to differing Branch Locations, they are subject to the same wage and hour policies and procedures established by Defendant.

(d) Plaintiff started in the Branch at 250 Park Avenue, New York, NY 10177, and was later assigned to the Soho Branch and sent back to the Park Avenue Branch. Other employees were also often transferred to other nearby Branch Locations on an as needed basis, such transfers would even occur mid-shift.

22.     At all relevant times, Defendant was and continues to be an "enterprise engaged in business" within the meaning of the FLSA and the state wage laws, and the regulations passed thereunder.

23.     At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class members was directly essential to the business operated by Defendant.

24.     Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## NATIONWIDE FLSA COLLECTIVE ACTION ALLEGATIONS

25.     Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all tellers, client experience associates, retail business bankers, relationship bankers, relationship managers, premier bankers, life and relationship bankers, and similar positions, employed at any Branch Location on or after the date that is three years before the filing of the Complaint in this case as defined herein ("FLSA Collective Plaintiffs").

26.     At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendant's decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them proper overtime wages at the rate of one-and-one-half times the regular rate of pay, due to time shaving. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiff.

27.     The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Defendant.

## NATIONWIDE RULE 23 CLASS ACTION ALLEGATIONS

28.     Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of herself and a class of all tellers, client experience associates, retail business bankers, relationship bankers, relationship managers, premier bankers, life and relationship bankers, and similar positions, employed at any Branch Location in the six (6) years, or the relevant statutory period of each state's applicable labor law if longer, prior to the filing of the Complaint in this case (the "Class").

29.     To the extent necessary, Plaintiff will designate subclasses for each of the States where Defendant has employees.

30.     All said persons, including Plaintiff, are referred to herein as the "Class." The Class members are readily ascertainable. The number and identity of Class members are determinable from the records of Defendant. The hours assigned and worked, the position held, and rates of pay for each Class member may also be determinable from Defendant's records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided by means permissible under F.R.C.P. 23.

31.     The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendant, there is no doubt that there are more than forty members of the Class. The proposed Class includes a Subclass of employees employed by Defendant in the States of New York, California, and States with requirements to provide earning statements to employees ("Wage Statement Subclass") who will

have additional state law claims against Defendant. There is no doubt that the Sub-Class also contains more than forty (40) members.

32.    Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All Class members were subject to the same practices of Defendant as alleged herein of: (i) failing to pay Class members proper wages, including overtime, due to off-the-clock work, and (ii) failing to pay Class members for breaks lasting 20-minutes or less. Further, due to the above violations all Class members experienced a failure to receive proper wage notices and proper wage statements, as required by state laws and regulations.

33.    Defendant's corporate-wide policies and practices affected all Class members similarly, and Defendant benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

34.    Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

35.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

Because losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendant and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

36.     Defendant and other employers throughout the country violate state wage and hour laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

37.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

> a.   Whether Defendant employed Plaintiff and the Class within the meaning of state wage and hour laws;

b.  What are and were the policies, practices, programs, procedures, protocols and plans of Defendant regarding the types of work and labor for which Defendant did not pay Class members properly;

c.  At what common rate, or rates subject to common methods of calculation, was and is Defendant required to pay Plaintiff and Class members for their work;

d.  Whether Defendant properly notified Plaintiff and Class members of their regular hourly rate and overtime rate;

e.  Whether Defendant properly compensated Plaintiff and Class members for all hours worked, including overtime hours;

f.  Whether Defendant failed to compensate Plaintiff and Class members for all hours worked, due to non-payment for off-the-clock work;

g.  Whether Defendant failed to compensate for breaks lasting 20 minutes or less;

h.  Whether Defendant required or permitted Plaintiff and Class members to work during uncompensated deducted meal breaks;

i.  Whether Defendant paid Plaintiff and Class members the proper overtime wages at a rate that is at least one-and-one-half times the regular rate of pay for all hours worked in excess of forty each workweek;

j.  Whether Defendant provided to Plaintiff and Class members wage and hour notices, at date of hiring and as required thereafter under state wage and hour laws; and

k.  Whether Defendant provided Plaintiff and Class members proper wage statements with each payment of wages as required by state wage and hour laws.

## STATEMENT OF FACTS

38.    In or around October 2017, Plaintiff was hired by Defendant to work as a Client Experience Associate and Teller at Defendant's Branch located at 250 Park Avenue, New York, NY 10177. Plaintiff's employment paused from July 2020 until April 2022, due to the COVID-19 pandemic. In April 2022, Plaintiff was rehired to work as a Client Experience Associate and Teller at Defendant's New York City Soho Branch. She worked there until around August 2023 when she was transferred back to the Park Avenue Branch, where she continues to work.

39.    At all relevant times, Plaintiff was scheduled to work from 8:30 a.m. to 5:00 p.m., with a half-hour lunch break, totaling eight hours per day, five days per week, for a total of forty hours per week. FLSA Collective Plaintiffs and Class members work similar schedules.

40.    Throughout her employment Plaintiff was compensated bi-weekly at three different hourly rates, as follows:

      a.    From October 2017 until April 2022, Plaintiff was paid $18.00 per hour.

      b.    From April 2022 until January 2024, Plaintiff was paid $23.00 per hour.

      **c.**    From January 2024 until the present, Plaintiff has been paid $30.00 per hour.

**Wage and Hour Claims**

41.    Plaintiff, FLSA Collective Plaintiffs, and Class members were not paid for all overtime hours worked. Plaintiff was specifically told by her supervisors early in her employment with Defendant that she could not record overtime hours even if she worked over 40 hours for any particular weeks. When Plaintiff attempted to self-report more hours than their scheduled shift, she would be reprimanded by supervisors since it was against Defendant's policy. Plaintiff would often be instructed by her supervisors she could not work overtime, could only report scheduled hours, and was directed to underreport her hours so that it reflects forty (40) hours on her timesheet.

As a result, Plaintiff was never paid overtime for all hours worked in excess of forty (40) hours per week. Plaintiff estimates she would be missing approximately five hours of overtime from each pay week. Similarly, FLSA Collective Plaintiffs and Class members did not receive compensation for all hours worked, including overtime hours.

42.    Defendant instituted a nationwide policy of not compensating meal breaks of employees, despite employees being forced to work through the entirety of their lunch.

43.    Because of the greater demand for service, Defendant instituted a policy requiring employees to continue working through their lunch break. However, Defendant still required Plaintiff to log her lunch breaks on her time records, essentially clocking herself out. Defendant never paid Plaintiff or other employees for the work they performed while technically clocked out during their lunch break.

44.    While clocked-out for lunch, employees were required to eat at their station, undergo mandatory training, respond to phone calls, and aid walk-in customers at teller windows. Plaintiff was (i) not permitted to leave their premises of work for lunch, (ii) not permitted a free and clear meal-break and (iii) were forced to work through lunch entirely. Despite employees like Plaintiff never being permitted a free and clear meal-break, Defendant never compensated Plaintiff and other employees for this time.

45.    Due to Defendant's policy of not compensating meal breaks, Plaintiff, FLSA Collective Plaintiffs and Class members were not compensated for at least thirty minutes per day worked. As a result, Plaintiff, FLSA Collective Plaintiffs and Class members did not receive compensation for all hours worked, including overtime hours worked.

46.    Additionally, Plaintiff would clock out for a short, less than 20-minutes, rest breaks. However, she was not compensated for this time even though it is compensable work time under

FLSA and State wage laws. FLSA Collective Plaintiffs and Class members were similarly not paid for these short rest breaks. The extent of the damages due to this violation can be calculated directly from Defendant's records for Plaintiff, FLSA Collective Plaintiffs, and Class members.

47.     At all times, Plaintiff was forced to work off the clock post-shift every day. Although Plaintiff was always scheduled to leave at five, she was required to remain up to an hour after work in order finish her tasks for the day, including proofing ATMs, recording and sending tills, closing down the public areas of the office, and finishing work on any accounts opened or managed that day. FLSA Collective Plaintiffs and Class members were required to perform similar post-shift work off-the-clock each day.

48.     Plaintiff was also required to do work from home before and after her shift. Although Plaintiff was supposedly scheduled to work strictly between 8:30 AM and 5:00 PM, Plaintiff's manager required her to be available at all hours to take his calls and address any issues that he deemed "urgent." Plaintiff's manager regularly called or texted her before she came in or after she was scheduled to leave in order to discuss client problems, issue instructions, and go over information about clients or Plaintiff's duties as a teller. *See* **Exhibit A**, Texts Between Plaintiff and Manager Aimon.

49.     Despite the fact that Plaintiff often worked outside of her scheduled hours, Plaintiff was forced by her manager to adjust her worked hours so that they matched her scheduled hours. Defendant's timekeeping system required all employees to self-report their time through an online portal on company computers. Any time that Plaintiff attempted to enter hours beyond what she was scheduled for or failed to edit her hours when they clocked greater than forty in a week, her manager would reprimand her and threaten her with disciplinary action or termination and force her to change her hours to reflect her schedule. Plaintiff's manager also threatened employees at

her branch by promising to withhold their bonuses if they logged any overtime—even if the manager was the one to direct them to perform work after hours. FLSA Collective Plaintiffs and Class members were required to perform similarly required to self-report their time and prohibited from including all hours actually worked.

**Wage Notice and Statement Claims**

50.    At all relevant times, Plaintiff never received a wage notice from Defendant. She also did not receive proper wage statements from Defendant. Similarly, Sub-Class members did not receive wage notices or proper wage statements.

51.    In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendant knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff at the beginning of her employment with Defendant.

52.    Defendant further violated the WTPA by failing to provide Plaintiff with accurate wage statements.

53.    The States of New York and California have wage laws providing damages for the failure to provide accurate pay documents.  In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL— and California Labor Code 226 LC, Defendant knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Wage Statement Subclass members at the beginning of their employment with Defendant.

54.    Defendant further violated the WTPA and California Labor Code 226 LC by failing to provide Plaintiff and Wage Statement Subclass members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA and California Labor Code 226 LC. *See Shi Yong Li*

*v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

55.    In failing to provide any wage statements and notices, Defendant has failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

56.    Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff. Defendant's conduct actually harmed Plaintiff. Defendant's failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime

rates, deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doings, and necessitated the current litigation to vindicate Plaintiff's rights. This conduct ensured Defendant's ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendant's failure to provide wage notices and wage statements to employees allowed Defendant to hide their responsibility and deprive employees of timely compensation.

57.    Had Defendant provided any wage statements to Plaintiff which accurately listed the total number of hours Plaintiff actually worked and her proper pay rates, as required by law, Defendant would have had to either (a) increase Plaintiff's wages to correspond to the hours she actually worked or (b) forthrightly acknowledge, by way of the wage statement, that Plaintiff's wages did not correspond to the hours she actually worked. Either possibility would have allowed Plaintiff to vindicate her rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

58.    The failure to provide any wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff. This delayed payment caused Plaintiff to struggle to pay bills and other debts.

59.    The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. *See Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846,

846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").1

60.    The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

61.    "In the wake of the Supreme Court's decision in TransUnion, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a

---

1 It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, *4 (S.D.N.Y. July 14, 2022)).

62.    Here, it is clear that Defendant's failure to provide Plaintiff with any wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendant's automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendant submitted to the IRS on behalf of Plaintiff. That, in turn, would have increased Plaintiff's entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

63.    Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

64.    The case at bar is somewhat different from *Coward* inasmuch as Defendant actually underpaid Plaintiff rather than merely misreporting her income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income

that triggers benefits, and losing benefits is an injury." Id. Plaintiff lost benefits by virtue of how

Defendant reported her income, and how Defendant reported Plaintiff's income was the direct

outcome of the inaccuracies in Plaintiff's wage statements. That is why "Plaintiffs have standing

to enforce the statutory reporting requirements" imposed by the WTPA. Calderon v. Witvoet, 999

F.2d 1101, 1106 (7th Cir. 1993).

65.     The *Calderon* court stressed that an employee's interest in ensuring that an

employer properly report the employee's income is amplified by the difficulty of persuading the

government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively
> depends on reports that employers send to the government. A worker who seeks
> credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4),
> which will be hard to carry if the employer has not furnished the customary
> documentation. The government believes employers who report earnings, because
> these reports are costly to make--they entail paying a substantial tax. The
> government tends not to believe undocumented claims by employees, because these
> claims are essentially costless yet could establish entitlement to large pensions or
> disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets
> make the proper reports of their income. *Id.*

*Calderon,* 999 F.2d 1101 at 1106.

66.     Here, the problem is not merely challenging but insurmountable. Plaintiff cannot

even attempt to have her earnings report corrected because Defendant did report what they actually

paid Plaintiff. The problem, rather, is that Plaintiff was underpaid. Yet the ultimate effect is the

same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement

depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was

irreversibly injured with respect to her social security benefits as soon as Defendant sent their W-

2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42

U.S.C. § 413(a)(2)(A)(ii)).

67.    Defendant knowingly and willfully operated their business with a policy of not providing proper wage notices, at the beginning of employment and annually thereafter, pursuant to the requirements of NYLL and other state wage laws.

68.    Defendant knowingly and willfully operated their business with a policy of not providing proper wage notices and statements as required by NYLL and other state wage laws.

69.    In failing to provide proper wage statements and notices, Defendant has failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the State legislature of New York. Defendant's failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendant's conduct, there is a reason why the State legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being paid properly and timely.

70.    Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff and Wage Statement Subclass members.  Defendant's conduct actually harmed Plaintiff and Wage Statement Subclass members.  Defendant's failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates and the failure to provide a wage notice properly listing the rate and frequency Plaintiff and Wage Statement Subclass members were entitled to get paid, deprived employees of the ability to contest Defendant's calculations, allowed Defendant to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff and Wage Statement Subclass members' rights.  This conduct ensured Defendant's ability to

further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Moreover, Defendant's failure to provide wage notices allowed Defendant to hide the proper frequency of pay to employees. Defendant's failure to provide a wage notice to employees allowed Defendant to hide their responsibility and deprive employees of timely compensation.

71.     Due to Defendant's failure to provide legally mandated notices such as earning statements and wage notices, Defendant was able to hide their wrongdoing from employees, and continue to attempt to hide their wrongdoing necessitating the current litigation. The failure to provide notices continues to result in delayed payment of all proper wages owed to Plaintiff and Wage Statement Subclass members. This delayed payment caused Plaintiff and Wage Statement Subclass members to struggle to timely pay bills and delay or forgo purchases.

72.     Defendant knowingly and willfully subjected Plaintiff, FLSA Collective Plaintiffs, and Class members to time shaving of hours worked in violation of the FLSA and the State wage laws.

**Plaintiff's Individual Discrimination Claims**

73.     In or around July 2024, Plaintiff became pregnant. When she disclosed her pregnancy to her manager, Aimon (hereafter "Manager Aimon" or "Aimon"), she suffered from a deluge of harmful discriminatory actions at the hands of Defendant and Manager Aimon.

74.     Although Plaintiff had disclosed her pregnancy to Manager Aimon, he regularly refused to allow her to take days off in order to care for herself and her unborn child. Plaintiff's pregnancy was diagnosed as "high risk" by her doctors (a fact of which Aimon had been appraised) and she suffered from extreme morning sickness and muscle cramps, as well as extremely high blood pressure which required regular medication and daily monitoring.

75.     Plaintiff's doctors recommended that she eat continuously throughout the day and stay off her feet in order to manage her blood pressure and cramping. When Plaintiff communicated those requests to Manager Aimon, he refused to accommodate her and told her that if she was unable to perform all of her duties like her colleagues, she would be fired.

76.     As a result of Manager Aimon's refusal to accommodate Plaintiff's medical needs, Plaintiff's symptoms were exacerbated. On more than one occasion, Plaintiff was forced to check in to the emergency room as a result of her symptoms. *See* **Exhibit B**, Plaintiff's Emergency Room Notes. On these occasions she provided Manager Aimon with doctor's notes and other documentation from her doctors explicitly referencing her pregnancy and the challenges that she faced. *See* **Exhibit C,** Doctors Notes. Even when faced with such documents however, Manager Aimon refused to allow her to take more leave and even threatened to fire her if she continued to miss workdays.

77.     Beyond simply denying Plaintiff her lawful sick leave for pregnancy-related issues, Defendant also interfered with Plaintiff's attempt to exercise her rights under the FMLA. When Plaintiff first tried to speak to Aimon regarding her maternity leave, he refused to talk to her, suggesting that it was "still early" and she might yet "decide to have an abortion." That statement was not only wholly inappropriate, but Manager Aimon also had no legal right to delay or impede Plaintiff's request for maternity leave simply because he believes she might or should get an abortion at a future date. Manager Aimon's beliefs about Plaintiff's decisions have no bearing on her right to request and take leave.

78.     Even after it became clear that Plaintiff would not, in fact, have an abortion, Manager Aimon continued to try to prevent or discourage Plaintiff from taking maternity leave. On multiple occasions, Aimon told Plaintiff that it was not guaranteed that she would keep her

position upon returning from maternity leave or even that she would not even retain her employment with Defendant in any capacity. Aimon referenced one of Plaintiff's colleagues, Ali Aftab, whom he criticized for taking paternity leave. Aimon told Plaintiff that Mr. Aftab's leave was "irresponsible" and told her that he would likely lose his job when he returned from leave, insinuating that the same thing would happen to Plaintiff if she also took leave.

79.    He also told her that taking maternity leave in any capacity would affect her performance ratings for the year, which could potentially lead to her termination. In order to ameliorate that "problem," Aimon suggested that Plaintiff take only partial leave, work from home during leave, or take no leave at all. He also told her that taking any leave would prevent her from receiving both a bonus and a raise in 2025.

80.    On October 16th, 2024, Manager Aimon informed Plaintiff that, despite being next in line for a promotion, he had removed her from consideration because of her pregnancy. In that conversation he told Plaintiff that she had gained a reputation for frequently calling out. When Plaintiff pointed out that those days had been taken due to her pregnancy, that she had provided doctor's notes for each of them, and that some of the visits were a result of Manager Aimon's unwillingness to accommodate Plaintiff's requests which exacerbated her symptoms necessitating emergency room visits, Aimon suggested that she simply quit and that the door was always open if she wanted to "focus on family matters."

81.    Manager Aimon later sent her an email memorializing that meeting where he listed everything that they talked about in bullet points. *See* **Exhibit D**, Email About 10/17/24 Meeting with Aimon. Somewhat unsurprisingly, that email contained no mention of Plaintiff's pregnancy, her requests for leave, her production of doctor's notes, or her promotion. Instead, Aimon disingenuously records that he spoke to Plaintiff about her "punctuality and time management"

issues and advised her that her calling out for "non-emergency" problems was affecting the team and her performance ratings.

82.    In addition to his refusal to accommodate Plaintiff and his retaliation against her for continuing to pursue her pregnancy, Manager Aimon also denigrated Plaintiff to her colleagues with regards to her pregnancy. Some of Plaintiff's colleagues told Plaintiff that Aimon had told them that he wanted to fire her because "he did not want to work with someone who was uncertain about who the father of her child was." Manager Aimon did not know anything about Plaintiff's relationship with her child's father. He also publicly criticized her lateness and absences and told other employees that she was lazy and the cause of their overwork. Many of Plaintiff's co-workers, such as Ali Aftab and Viviana [LNU], witnessed and can attest to this treatment and its contributing effect to Plaintiff's deteriorating health condition.

83.    When Plaintiff complained to Manager Aimon regarding his behavior, he reiterated his dissatisfaction with Plaintiff's lateness and choices regarding her pregnancy. He also told her that she should be careful about "going against him" because he had a lot friends "higher up" and proceeded to list off employees he had fired or gotten fired, including Stanley Hidalgo and Anne-Marie [LNU].

84.    Furthermore, while Plaintiff may have intended to tell her colleagues when and why she was going on leave, Manager Aimon took that decision from her by telling others of her pregnant condition, which she had disclosed to him in confidence, prior to her revealing her pregnancy publicly. CFR § § 825.307 and 825.500 addressing the FMLA, put forth recordkeeping requirements by which employers must maintain separate and confidential records of the health information which is disclosed during an employee's request for leave. Manager

Aimon violated those requirements by revealing Plaintiff's confidential condition to others before she wished to do so herself and before it became obvious to the public.

85.     There are many reasons why someone might wish to keep their pregnancy to themselves for a time, including the possibility of miscarriage as well as the potential for discriminatory behavior, as Manager Aimon so aptly demonstrated. Regardless of Plaintiff's reasons, the choice was hers to make, and Defendant had a duty to safeguard her confidentiality with regards to her protected medical information.

86.     Finally, in December of 2024, one of Defendant's regional managers, Tom [LNU], came to the bank for a routine check-in. With Tom's help, Plaintiff was able to successfully apply for and take leave, however, Plaintiff still has not received her bonus for 2024, as Manager Aimon threatened would happen, and she has not been restored to consideration for any promotions. Moreover, from July 2024 until she was able to take leave, Plaintiff was subjected to months of harmful discriminatory actions at the hands of Defendant and Manager Aimon,

87.     Defendant's refusal to accommodate Plaintiff's pregnancy and retaliation against her for asserting her rights caused her severe emotional and physical distress and placed the health and well-being of herself and her unborn child at risk.

88.     Defendant knowingly and willfully operated their business with a policy of not properly compensating either FLSA overtime rate (of time and one-half) or the NYLL overtime (of time and one-half) to Plaintiff, FLSA Collective Plaintiffs, and Class members, due Defendant's policy of time shaving.

89.     Defendant knowingly and willfully subjected Plaintiff, FLSA Collective Plaintiffs, and Class members to time shaving of hours worked in violation of the FLSA and the NYLL.

90. Defendant knowingly and willfully failed to provide Plaintiff FLSA Collective Plaintiffs, and Class Members with proper wage notices and wage statements in violation of the NYLL.

91. Defendant knowingly and willfully interfered with Plaintiff's exercise of her rights under the FMLA, NYSHRL, NYCHRL, and the ESSTA.

92. Defendant knowingly and willfully retaliated against Plaintiff for exercising her legal rights with respect to her pregnancy and related conditions in violation of the FMLA, NYSHRL, NYCHRL, and the ESSTA.

93. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff FLSA Collective Plaintiffs, and the Class, in this litigation and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

### COUNT I

### VIOLATION OF THE FAIR LABOR STANDARDS ACT

94. Plaintiff realleges and incorporates all the foregoing paragraphs as if fully set forth herein.

95. At all relevant times, Defendant was and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individual within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

96. At all relevant times, Defendant employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

97. At all relevant times, Defendant had gross annual revenues in excess of $500,000.

98.     At all relevant times, Defendant had a policy and practice of failing to pay overtime wages to Plaintiff and FLSA Collective Plaintiffs for hours worked in excess of forty (40) per workweek at the proper overtime rate that is at least one-and-one-half times the regular rate of pay, due to time shaving.

99.     Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendant. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

100.     Defendant knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs for all hours worked, including overtime hours, when Defendant knew or should have known such was due.

101.     Defendant failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

102.     As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

103.     Due to the intentional, willful and unlawful acts of Defendant, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime wages; unpaid wages, including overtime, due to time shaving; plus an equal amount as liquidated damages.

104.    Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

105.    Plaintiff realleges and incorporates all the foregoing paragraphs as if fully set forth herein.

106.    At all relevant times, Plaintiff and Class members were employed by the Defendant within the meaning of the NYLL, §§2 and 651.

107.    Defendant knowingly and willfully violated Plaintiff's and Class members' rights by failing to pay overtime wages for hours worked in excess of forty (40) per workweek at the proper overtime rate that is at least one-and-one-half times the regular rate of pay, including due to time shaving, in violation of the NYLL.

108.    Defendant knowingly and willfully failed to provide wage and hour notices to Plaintiff and Sub-Class members, as required by NYLL § 195(1).

109.    Defendant knowingly and willfully failed to provide proper wage statements to Plaintiff and Sub-Class members with every wage payment, as required by NYLL § 195(3).

110.    Due to the Defendant's NYLL violations, Plaintiff and Class members are entitled to recover from Defendant her unpaid overtime wages; unpaid wages, including overtime, due to a policy of time shaving; statutory penalties; reasonable attorney's fees; and costs and disbursements of the action.

## COUNT III

### VIOLATION OF APPLICABLE STATE WAGE AND HOUR LAWS
**(brought on behalf of a Rule 23 Class)**

111.    Plaintiff realleges and incorporates all the foregoing paragraphs as if fully set forth herein.

112.    At all relevant times, Class members were employed by Defendant within the meaning of the applicable state wage and hour laws, just as Plaintiff was employed by Defendant under the meaning of the FLSA.

113.    Plaintiff can represent the Class because the requirements of the FLSA and the requirements of the state labor laws enumerated earlier are identical for purposes of their overtime class claims.

114.    Defendant knowingly and willfully violated Plaintiff and Class members' rights by failing to pay them the proper overtime compensation at rates of not less than one and one-half times the regular rate of pay for each hour worked in excess of forty (40) hours in a workweek due a policy of underreporting employees' hours, in violation of the state wage and labor laws outlined above.

115.    Defendant knowingly and willfully failed to provide proper wage statements and notices to Wage Statement Subclass members, as required under the laws of New York State, California, and Minnesota.

116.    Due to Defendant's state law violations, Plaintiff and Class members are entitled to recover from Defendant their unpaid overtime compensation, damages for unreasonably delayed payments, statutory penalties, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action.

117.    In addition to violations of State Labor overtime laws under which Plaintiff brings class (not individual) claims, Defendant violated State provisions requiring employers to pay employees all wages owed.  Since overtime wages are owed under the FLSA, these laws encompass class members' claims just as much as would explicit overtime requirements.  These state law provisions include the following:

> [e]ach employer in [Arizona] shall designate two or more days in each month, not more than sixteen days apart, as fixed paydays for payment of wages to his employees [and that] [e]ach employer shall, on each of the regular paydays, pay to the employees . . . all wages due the employees up to such date . . . .[o]vertime or exception pay shall be paid no later than sixteen days after the end of the most recent pay period."

Ariz. Rev. Stat. § 23-351(C); *see also Weeks v. Matrix Absence Mgmt.*, 2022 U.S. Dist. LEXIS 30849 (D. Ariz. 2022)

> Upon prevailing in an action brought pursuant to this section, aggrieved persons shall recover the full amount of any unpaid back wages unlawfully withheld plus the same amount as liquidated damages and shall be awarded reasonable attorney's fees and costs.

Florida Minimum Wage Act, Fla. Stat. § 448.110(6)(c)(1)

> Damages recoverable by an employee. When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3, whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary. In other instances the employer shall be liable only for unpaid wages or expenses, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses.

Iowa Wage Payment Collection Law, Chapter 91A.8; *see also Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 883 (N.D. Iowa 2008) ("[T]he FLSA may be used to establish an employee's right to a certain amount of wages under the IWPCL and an employer's violation of the IWPCL for not paying all wages due its employees." (quotation omitted))

> (a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by

the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.

Louisiana Wage Payment Act, La. R.S. § 23:631(A)(1)

An employee having a claim for wages which are not paid within thirty days of the regular payday designated or agreed upon may institute suit for such unpaid wages in the proper court. If an employee establishes a claim and secures judgment on the claim, such employee shall be entitled to recover the full amount of the judgment and all costs of such suit, including reasonable attorney's fees.

Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1231(1)

In case of any failure to pay wages due to an employee as required by Section 41-10-40 or 41-10-50 the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow. Any civil action for the recovery of wages must be commenced within three years after the wages become due.

South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-80(C).

118. The Florida Minimum Wage Act has a pre-suit notice requirement. Fla. Stat. § 448.110(6)(a). However, Plaintiff invokes the Florida Minimum Wage Act not only in her individual capacity but to bring class claims on behalf of class members residing in Florida. Thus, Plaintiff is not personally required to provide Defendant with a pre-suit notice as to each class member. As to these absent Florida class members, courts in Florida have "found no authority mandating that a detailed pre-suit notice for each and every putative class member be served on [d]efendants under § 448.110(6) prior to the filing of a putative class action under the FMWA." *Griffith v. Landry's, Inc*., 2016 U.S. Dist. LEXIS 196397, *12 (M.D. Fla. May 17, 2016).

119. The Third Circuit Court of Appeals has clearly demonstrated the untenability of any such requirement:

We raise the following questions to further demonstrate the error of the proposed framework adopted by our dissenting colleagues. If the dissent's "colorable legal claim" test is a threshold inquiry for commonality, why should the court not consider every potential disqualifier from one's having a "colorable legal claim?" For example, in any class certification case, should the court consider whether all potential class members complied with applicable pre-notice requirements under the relevant substantive law? Should the court consider whether every potential class member exhausted her administrative remedies under the relevant substantive law? Should the court evaluate whether each class member's claim complies with the applicable statute of limitations? The answers to these questions most certainly implicate whether a litigant, in a class action or otherwise, has a "colorable legal claim." These questions, moreover, show how flawed, from an administrative, logical, and practical standpoint, the dissent's and objectors' approach really is. No class would ever be certified because it would be impossible to demonstrate that every class member has a "colorable legal claim." (Dissenting Op. at 10.) More than this, it would gut commonality, for, most certainly, individual issues would then predominate. There would simply be no class that could meet this commonality and predominance test.

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310 (3rd Cir. 2011).

120.    Some states' wage and hour or wage payment statutes may prescribe means other than class actions for pursuing common claims.  Any state restrictions on class actions are irrelevant, however, as this case was filed in federal court, where the Federal Rules of Civil Procedure hold. See *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 400, (2010) (F.R.C.P. 23 authorizes "class actions across the board" notwithstanding state law restrictions on class actions); *Dremak v. Iovate Health Scis. Grp., Inc. (In re Hydroxycut Mktg. & Sales Practices Litig.)*, 299 F.R.D. 648, 654 (S.D. Cal. 2014) ("[A]pplication of Rule 23 to Plaintiffs' [FBPA] claims does not run afoul of the Rules Enabling Act. Rule 23 governs Plaintiff's claims, and Plaintiff's claims are not subject to dismissal based on the state statutes prohibiting class actions."); *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015) ("The bottom line is this. The Alabama statute restricting class actions, like the New York statute at issue in *Shady Grove*, does not apply in federal court. Rule 23 controls.").

121.     Due to Defendant's state law violations, Plaintiff and Class members are entitled to recover from Defendant their unpaid overtime compensation, damages for unreasonably delayed payments, statutory penalties, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action.

**COUNT IV**

**<u>INTERFERENCE AND RETALIATION UNDER</u>**
**<u>THE FAMILY AND MEDICAL LEAVE ACT</u>**

122.     The FMLA states in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period …. because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S. Code § 2612(a)(1)(D).

123.     The FMLA defines serious health condition as, "an illness, injury, impairment, or physical or mental condition that involves … continuing treatment by a health care provider. 29 U.S. Code § 2611(11).

124.     Section 2615(a) of the FMLA, states in pertinent part:

Interference with rights.

i.     Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

ii.     Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

125.     Defendant is subject to the FMLA as a covered employer. Defendant is a covered employer because they employ fifty (50) or more employees for each working day during each of the twenty (20) or more calendar workweeks in the year preceding their violation of Plaintiff

35

CRUZ's rights under the FMLA. Defendant has more than thirty (30) employees and therefore meet FMLA standards.

126.    Plaintiff CRUZ is an eligible employee under the FMLA because she had worked at least 1,250 hours in the 12 months preceding her request for leave.

127.    Defendant interfered with Plaintiff CRUZ's rights under the FMLA by threatening to terminate her because she requested time off for maternity leave and took time off to see doctors in relation to her pregnancy and by denying her time off to see doctors with regards to her pregnancy.

128.    Defendant retaliated against Plaintiff CRUZ when they denied her a promotion based on her request for time off under the FMLA.

129.    Plaintiff CRUZ seeks all applicable remedies under the law, including compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT V

## DISCRIMINATION AND RETALIATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

130.    Plaintiff realleges and reavers by reference all allegations in all the preceding paragraphs as if fully set forth herein.

131.    The New York State Human Rights Law ("NYSHRL") provides: "It shall be an unlawful discriminatory practice: For an employer … because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." New York State Executive Law § 296(1)(a).

36

132.    The New York State Human Rights Law not only prohibits sex discrimination generally but also makes it "an unlawful discriminatory practice for an employer … to refuse to provide reasonable accommodations to the … pregnancy-related conditions … of an employee." N.Y. Exec. Law § 296(3)(a)-(b).

133.    Here, Plaintiff was discriminated and retaliated against because she was pregnant.

134.    Defendant's conduct was willful or undertaken with reckless disregard of Plaintiff's protected rights under the NYSHRL.

135.    As a direct and proximate result of Defendant's unlawful acts in violation of NYSHRL, Plaintiff has suffered economic harm as well as severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and relief, including punitive damages and attorneys' fees.

136.    Due to Defendant's violations under the NYSHRL, Plaintiff is entitled to recover from Defendant: (1) back wages; (2) compensatory damages; (3) punitive damages; and (4) attorneys' fees and costs.

## COUNT VI

## DISCRIMINATION AND RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

137.    Plaintiff realleges and reavers by reference all allegations in all the preceding paragraphs as if fully set forth herein.

138.    The New York City Human Rights Law ("NYCHRL") prohibits discrimination in the terms, conditions, and privileges of employment providing that:

It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or

citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

The New York City Administrative Code § 8-107(1).

139.    At all relevant times, Defendant employed at least four (4) persons. Plaintiff was an employee and qualified person within the meaning of the NYCHRL and Defendant is the covered employer under the NYCHRL.

140.    Here, Plaintiff was discriminated, retaliated against and terminated because she was pregnant.

141.    Defendant operated a business that discriminated against Plaintiff on the basis of her pregnancy in violation of the NYCHRL. The New York City Human Rights Law makes it "an unlawful discriminatory practice" for any private employer to refuse a reasonable accommodation to an employee for "pregnancy, childbirth or related medical condition." N.Y.C. Admin. Code § 8-107(22)(a).

142.    Under the NYCHRL, an employer is liable for the discriminatory conduct by an employee, agent or independent contractor. The NYCHRL provides in relevant part:

(a) An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.
(b) An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:
(1) the employee or agent exercised managerial or supervisory responsibility; or
(2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

38

(3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

Administrative Code § 8-107(13)

143.    Here, the prerequisites haves been satisfied, since Defendant refused Plaintiff's request for leave and denied her a promotion explicitly as a consequence of her pregnancy.

144.    Defendant's conduct was willful or undertaken with reckless disregard of Plaintiff's protected rights under the NYCHRL.

145.    As a direct and proximate result of Defendant's unlawful acts in violation of NYCHRL, Plaintiff has suffered economic harm as well as severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and relief, including punitive damages and attorneys' fees.

146.    Due to Defendant's violation under the NYCHRL, Plaintiff is entitled to recover from Defendant: (1) back wages; (2) compensatory damages; (3) punitive damages; and (4) attorneys' fees and costs.

**COUNT VII**

**INTERFERENCE AND RETALIATION UNDER
THE EARNED SAFE AND SICK TIME ACT**

147.    Plaintiff realleges and incorporates all the foregoing paragraphs as if fully set forth herein.

148.    At all relevant times, Defendant employs five or more employees and were employers covered by the ESSTA's sick leave provision as an "'employer' as defined in subdivision (3) of section 190 of the labor law." ESSTA § 20-912.

149. The ESSTA allows that any employee of a covered employer is entitled to use sick time for "absence form work due to: (a) such employee's mental or physical illness, injury or health condition…" ESSTA § 20-914(a).

150. Furthermore, the ESSTA provides, in part:

    a. No person shall interfere with any investigation, proceeding or hearing pursuant to this chapter.

    b. No person shall take any adverse action against an employee that penalizes an employee for, or is reasonably likely to deter an employee from, exercising or attempting to exercise rights under this chapter or interfere with an employee's exercise of rights under this chapter and implementing rules.

151. Defendant violated the ESSTA when they refused to allow Plaintiff to take time off to address her serious health condition and when they denied her a promotion and threatened to fire her for attempting to take such time off.

152. Due to Defendant's ESSTA violations, Plaintiff is entitled to all applicable remedies under law including: (i) compensatory damages, (ii) punitive damages, and (iii) attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, FLSA Collective Plaintiffs, and Class members, respectfully requests that this Court grant the following relief:

a) A declaratory judgment that the practices complained of herein are unlawful under the FLSA, FMLA, NYLL, NYSHRL, NYCHRL, the ESSTA, and State wage laws;

b) An injunction against Defendant and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c)  An award of unpaid wages, including overtime compensation at the proper rate of one-and-one-half times the regular rate of pay for hours worked in excess of forty (40) per workweek, due to time shaving due under the FLSA and State wage laws;

d)  An award of statutory penalties as a result of Defendant's failure to comply with the State wage laws' wage notice and wage statement requirements;

e)  An award of liquidated and/or punitive damages as a result of Defendant's willful failure to pay for overtime wage, pursuant to the FLSA and/or state wage laws;

f)  An award of backpay, compensatory damages, and punitive damages due under the ESSTA;

g)  An award of backpay, compensatory damages, and punitive damages due under the NYSHRL;

h)  An award of backpay, compensatory damages, and punitive damages due under the NYCHRL;

i)  An award of backpay, compensatory damages, and punitive damages due under the FMLA;

j)  An award of prejudgment and postjudgment interest, costs and expenses of this action together with reasonable attorneys' and expert fees;

k)  Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

l)  Designation of this action as a class action pursuant to F.R.C.P. 23;

m) Designation of Plaintiff as Representative of the Class and Subclass; and

n)  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: September 24, 2025                Respectfully submitted,

                              By:    */s/ C.K. Lee*_____
                                     C.K. Lee, Esq.

                                     LEE LITIGATION GROUP, PLLC
                                     C.K. Lee (CL 4086)
                                     Anne Seelig (AS 3976)
                                     148 West 24th Street, 8th Floor
                                     New York, NY 10011
                                     Tel.: 212-465-1188
                                     Fax: 212-465-1181
                                     *Attorneys for Plaintiff,*
                                     *FLSA Collective Plaintiffs, and the Class*